Judge Burnet’s
dissenting opinion:
From the most careful examination which I have been able to give to' this case, my mind is brought to the conclusion, that the complainant is entitled to a decree.
As I am so unfortunate, in this opinion, as to differ from the rest of the court, it becomes my duty to state the grounds on which it is formed; and in doing this, it will be necessary to consider, not only the point on which the case has been decided, but also the other points taken by the defendants, or at least such of them as would, if decided i.n their favor, preclude the complainant from a decree. The defense may be considered as resting on three grounds:
1. The alleged insufficiency of the statute of Yirginia to vest in the administrator a power to make the contract. First, because the statute is not to be regarded in this state, and secondly, because the will is not within the provisions of the statute.
2. The inadequacy of the price to be paid by the complainant.
3. That the complainant has been guilty of laches in not paying the purchase money at the time it became due.
On the first point it is contended, that the courts of this state will not regard the laws of Yirginia, so far as to consider the con *123 tract of sale, made by the administrator with *the will annexed, as a legal execution of the power granted to the executor.
On this point, it may be remarked that the laws of Ohio do not require contracts for the sale of land to be made within the state, nor do they prescribe any form in which they shall be drawn, provided they are in writing, signed by the party, or by some person lawfully authorized.
Contracts may be made in person, or by an agent, and we have no established exclusive form of creating an agency. It is not necessary that it should be created or executed within the state. The agent may reside in another state; he may receive his power there, and there he may execute it. We have nothing to control the discretion, or restrain the will of a person of full age and sound mind, in the disposition of his land. Neither the interest of the state, nor the safety of individuals, requires that we should.
A contract to sell is only an expression of the will of the owner, in the exercise of legal right, and if that will be expressed on a sufficient consideration, it must be respected, without regard to form. Acts done in another state, in conformity with its laws, so as to be valid and binding there, are to be considered as valid and binding here, if they do not contravene our own laws. The laws of every well-regulated state prescribe some mode of conveying real property; and, when a contract is made for that purpose, the execution of it must conform to the law of the state where the property lies. A foreign power can not prescribe a rule of property, or dictate a mode .of transferring it.
To effect a valid transfer of title, there must be the consent, of the owner, in the form of a contract, and also the legal execution of a conveyance. There is, however, no necessary connection between the act of contracting, which expresses the consent, and the act of carrying the contract into execution, which passes the title. They may, and frequently do, depend on different laws. The former is generally left to the direction of the common law; the latter is most usually regulated by statute. The former has but little influence on the policy of a state; the latter is of great importance, and is one of the most interesting attributes of state sovereignty. Hence it is, that prior to the statute for *the prevention of frauds and perjuries, the owner of land in Ohio might have bound himself to sell it by a verbal promise, made in any part of the world, and the courts of this state, having ascer* *124 tained the existence and consideration of the promise, by the ordinary rules of proof, would have enfo ced it; but the mode of transferring title was considered of such importance, that it formed a part of the ordinance for the government of the territory, and has ever since been regulated by statute. An attempt to divest a man of his property, without his consent, unless by the operation of a law which has constitutionally emanated from the supreme power of the state, would be oppressive, and could not be sustained in our tribunals; but when consent has been obtained, there remains no legal objection to the conveyance of the title, in the form prescribed by statute.
This distinction between the manner of making the executory contracts, and of executing them specifically, has been overlooked in argument. Counsel have attributed to the engagement, or promise to sell, the solemnity required by statute, in the transfer of title. The law relating to the execution of deeds has been applied to the execution of contracts for deeds. I am aware that every solemnity required by law, either in a contract for the sala of land, or in the deed by which it is to be conveyed, must be observed ; but it is no objection to a contract, that the law does not direct or expressly recognize its form, provided it does not prohibit it, or prescribe a different form. If the contract be good on common law principles, and is not repugnant to the statute of the state, it must be obligatory; or if it be good under the statutes of the state where it was made, and not repugnant to the laws of the state where it is to take effect, it must be regarded as obligatory.
It has been observed before, that our laws neither prescribe nor prohibit any form of contract. If it be in writing and signed, it is sufficient. On all other points the contracting parties are left to their own discretion. The owner of the land in Ohio may contract to sell it at home or abroad, in person or by agent, and he may constitute an agent in conformity with the laws of the country where he may reside or happen to be, as there is not anything in the laws of the state to prohibit it. It becomes, then, a mere ^matter of fact, whether Parker has authorized this contract agreeably to the laws of Virginia, and whether Baker has made it in pursuance of the authority given him. As the local laws of Ohio are silent on the point they have nothing to do with it.
Executory contracts, for the sale of real and of personal estate are *125 put, by the common law, as to the solemnity required, very much on the same ground. The distinction which now exists has been produced by statute. The only difference made by the laws of Ohio is that the former must be in writing. That peculiarity having beer, observed in the case before us, the contract stands, in other respects, on the ground of the common law. There is nothing in it, or in the mode of its execution, that is opposed to our law, nor is there anything not contained in it that is required by our law. As to its object, its form, and its mode of execution, it is in strict conformity with the law of Ohio; consequently, if Baker was vested with such a power as would have authorized him to sell the land had it been situated in Virginia, he must have been authorized, by the same power, to sell it without reference to its situation. In conformity with this principle, this court, on a bill relating to land similarly situated in this state, received a record of a decree rendered in the state of Virginia on a claim originating under the laws of that state, and held the decree to be binding on the parties; and as it appeared from the record, that an appearance had been effected for the defendants, they refused to look into the merits of the claim.
As the question presented in this part of the case relates only to the validity of an executory contract, it does not involve a rule of property. It is not a question of title, but of testimony, depending on general principles and not on the peculiar laws of Ohio. The first inquiry in relation to it is, does the testimony offered satisfy the mind that Baker had a power legally derived from Parker to make this contract? If he had it is our duty to enforce it. Its obligation and its construction depend on the laws of Virginia, where it was made; the mode of enforcing, or of carrying it into execution, depends on the laws of Ohio, where the land lies.
^Parker derived his title under the laws of Virginia, prior to the act of cession, when she had the right both of jurisdiction and of soil. The will was made in Virginia — the power was to be exercised there. Th e consideration money received was to be disbursed there, and the trustee was to account for the execution of his trust before the tribunals of that state and according to their laws. The validity of the will containing the power depended on those laws; and it would seem to follow, that the construction and legal effect of it should be determined by them also. If a citizen of another state can delegate a power to sell his lands *126 in Ohio, by a will executed agreeably to the laws of his own state, why may not the will be construed, and the rights and powers it confers be determined- and executed, in all respects, agreeably to those laws. The testator had them in view when he made his will; he relied on them for its construction, and he must have given the power in reference to the manner in which they authorized and required its execution. It is, then, the same as if he had recited the statute, or had given to the administrator, with the will annexed, in express words, the contingent power which the statute had given him. Parker was willing to vest this power in his executor, with a knowledge that if he did not prove the will the court would appoint an administrator, on whom the power would devolve. He therefore virtually gave the power, and authorized its execution by the administrator. As he appears to have been anxious that a sale of the land should be effected, it is presumable that he would have made an express provision for the contingency that happened if he had not relied on the remedy provided in the statute.
If a foreign legislature should pass a law affecting the title to lands in this state, or changing the mode of conveying them, it would be considered as a nullity; but the law in question has no operation on the land or on the mode of conveying it. It merely authorizes the proprietor to dispose of it, or to vest a power in some other person to sell it, in such manner and for such purposes as he may direct. It is the practice of every day, in appointing agents, to authorize them to make subagents, with all the powers *they possess themselves; and this is, substantially, the amount of what is here eomjdained of. In order that the will of the testator may not fail, and that the expense and delay of an application to chancery may be prevented, the act provides that the powers of the executor, special as well as general, may be performed, in certain cases, by an administrator; but no executor is required to submit to this provision. He may avoid it, either by nominating a trustee, to act in case the executor does not, or by an express limitation of the trust to the executor, to the exclusion of all other persons; and, when this is not done, it is an unequivocal adoption of the substitution provided by the statute. When Parker made his will he knew the law, he understood its operation, and intended to adopt the transfer of power which it provided. He virtually authorized fhe court to provide for the execution of the trust on failure of the executor to execute it. It *127 would seem that the power of the administrator was legally derived from. Parker himself.
Such was the doctrine laid down in the case of Melan v. Fitzjames, 1 Bos. & Pul. 133. The contract in that case had been made in France. Rook, Justice, said, “ this contract is considered in France as not affecting the person. ■ Then what does it amount to? It is a contract that the duke’s estate shall be liable to answer the demand, but not his person. If the law of Franco has said the person shall not be liable on such a contract, it is the same as if the law of France had been expressly inserted in the contract.”
Chief Justice Eyre declared, that, uif it be'a personal obligation there, it must be enforced here in the mode pointed out by the law of this country; but what the nature of the obligation is, must be determined by the law of the country where it was entered into, and then this country will apply its own law to enforce it; ” or, in other words, that the obligation of the contract depends on the lex loci, the mode of enforcing it on the lex fori. In Talleyrand v. Boulanger, 3 Ves. Jr. 447, the chancellor said it would be contrary to all the principles which guide the courts of our country, in deciding upon the contracts made in another, to give a greater effect to the contract than it would have by the laws of the country where it took place; ’’ and, by a parity of reasoning, it would be equally inconsistent with those principles to give it a less effect. Huberus, vol. 2, b. 1, t. 3, in treating of the lex loci contractus, says, “ that by the courtesy of nations, whatever laws are carried into execution within the limits of any government are considered as having the same effect everywhere, so far as they do not occasion a prejudice to the rights of other governments or their citizens.” If this courtesy be observed by nations, independent and unconnected, it ought to be adopted by states united under one government, the constitution of which requires full faith and credit to be given, in each state, to the public acts, records, and judicial proceedings of every other state: That no prejudice can result to the State of Ohio, or to her citizens, from an acknowledgment of the contract in question, is very apparent, from the fact that our own legislatures have introduced the same provision into their code, and have given to administrators, with the will annexed, the same power that was exercised by Baker under the statute of Virginia. This is an unequivocal expression of their *128 opinion that a power given to an executor to sell, may be transferred by law to an administrator, without prejudice to the public orto individuals; and, as the provision extends to foreign as well as domestic wills, it expressed the further opinion, that such a power, created and exercised in other states, according to their laws, may be safely recognized as valid and operative in ours.
I have no objection to the proposition laid down in this case by the majority of the court, that the executor derives his power from the testator; that he acts as a trustee, and possesses no power over real estate but such as is given by the will; that an administrator derives all his power from the law of the country where he receives his appointment, and that he has no power to act in any other jurisdiction unless it be conferred on him by the laws of that jurisdiction ; but I differ from them in the application of those principles. Their effect seems to be that Baker could not sell the land in question without the power given by the will; that the administrator, having received his power from the law of Yirginia, can not exercise it in the State of Ohio further than he is permitted by the law of Ohio.
*It appears to me that as the will gave the power to the executor, and as the law under which the will was made, and by which the testator intended it should be construed and executed, transferred that power to the administrator, it is the same in effect as if the testator had given the power to the administrator by name, and the administrator must be considered as having made the contract by the authority of that special power, and not in virr tue of the general power derived from his appointment.
The majority of the court admit that a contract made by Baker, in conformity with the power in the will, would have been good, and might have been enforced in the tribunals of this state. It must also be admitted that if the land in question had been within the jurisdiction of the State of Yirginia, the contract by the administrator would have been good. The question then is, whether a contract for the sale of land in Ohio, made in the State of Yirginia, by virtue of a power derived from the proprietor agreeably to the law of Yirginia, will be recognized in this state. This question, it appears to me, may be decided by adverting to the difference between a contract to sell and a deed by which'the title is to pass. The former may be made according to the laws of the state where the power is given and the agent resides; but the latter *129 must be done agreeably to the laws of the state where the land lies. Keeping this distinction in view, it will be difficult to assign a satisfactory reason why it is that a will which vests the administrator with power to contract for the sale of land in Virginia may not also vest him with power to contract for the sale of land lying in another state. A written contract made by Parker, in Virginia, agreeably to the forms recognized in that state for the sale of these lands, would have been good, though he could not have conveyed the title in any other form than that prescribed by the laws of Ohio; and why may not the administrator, vested with the power of Parker, agreeably to the laws of Virginia, do the same thing ?
Although the power of an administrator must be exercised within the jurisdiction which gave it, yet his acts, legally done within that jurisdiction, are to be regarded as valid in every part of the world. If he collects a debt and *gives a release, or does any other act authorized by law, or by the will annexed to his letters, it ought to be valid in any jurisdiction, as being within the scope of his power. But the ground taken by the court would seem not only to prevent a foreign administrator from acting within our jurisdiction, but to deny the validity of his acts, properly done within his own jurisdiction; for in this case he did not attempt to exercise power within our jurisdiction. He acted under the laws and within the jurisdiction of his own state, where his acts were legal and valid, and where the contract was lawful and obligatory. The application to this court is against the administrator, to obtain the benefit of that contract in the mode prescribed by our own laws.
As Baker’s power was derived entirely from the laws of Virginia, why do we recognize the validity of any of his acts ? I can give only one reason — because they were authorized by the laws of that state, and not forbidden by ours.
Parker could have contracted away these lands in Virginia; he could have conveyed them by deed, or he could have created an agent with power to do the same thing, and the only question would have been, was the power created according to the laws of that state, and was the deed conveying the title made in conformity with the laws of our state? On this ground I can not reject the contract of Baker, as having been made without authority. I con *130 sider him in loco testatoris, and, as to these lands, vested with power to do whatever his principal might have lawfully done!
I agree with the court, that the annexing of the will to the letters of administration can not change the tenure by which the administrator holds his office; but I contend that it may materially affect his powers and duties, as he is bound to take the will for his guide. I also admit that an administrator, by virtue of his general power, can not dispose of real estate, but I contend that Baker, in this case, did not act under his general power, but under a special power derived from Barker, in strict conformity to the laws of Virginia.
I dissent from the proposition laid down by the court, that a confirmation of this contract would recognize the bright of another state to interfere in the disposition of our lands, or to prescribe a mode in which it should be done. There is a great difference between a statute that authorizes a sale of land and prescribes the mode of executing deeds, and one that directs the manner in which the proprietor of land may constitute an agent, with power to sell, leaving the conveyance, and if required the form of the contract of sale, to be directed and controlled by the laws of the state where the land lies. The former of these, to which the objection of the court applies, has not been attempted in this case.
I can not admit that a recognition of the Validity of the statute in question interferes with the sovereignty of this state. That •statute merely designates the person who shall execute a power .given in conformity with its own provisions, and that may be executed within that state, leaving the form, and everything ■else connected with the execution of it, to the laws of the sovereignty within whose limits it is to operate. I take it to be true, .as a general proposition, that an executory contract, made in any ■state, under a power delegated according to the laws of that state, will be regarded as binding in any other state, and yet the sovereignty of the state where it operates is not considered as impaired.
. The court have placed the case altogether on the ground that ■the power to sell was conferred exclusively by the statute of Virginia, which seems to me to be a petitio principii. I consider that power is derived from the testator, by his own voluntary act. The statute provided a mode in which a power might be created, .to be executed precisely as this has been. The testator availed *131 himself of that mode, knowing, and consequently intending that it might be so executed. The power to convey is full and sufficient ; it emanates from the testator, and the only question is, by whom it may be executed.
But independent of every consideration, it appears to me that the right of the complainant is sustained by the statutes of this state. Our statute book has always contained a provision for putting wills, executed and proved out of the state, upon a footing with wills executed and proved *within it, as will appear by referring to the territorial law of 1795; section 2 of the state law of 1805 ; sections 12 and 13 of the act of 1818; sections 12 and 13 of the act of 1810; sections 12, 13, and 16 of the act of 1816, and sections 12, 13, 14, and 15 of the act of 1824. Under these provisions the will of Parker has been offered for probate, and recorded in the county of Brown, in which the lands lie. Section 12 of 1816 is in these words : “ Authenticated copies of wills and codicils, proved according to the laws of any state or territory of the United States, relative to any estate within this state, may be offered for probate in the court' aforesaid in the county where such estate shall lie. The court aforesaid may admit to record any such authenticated copies, and such copies, so admitted to record, shall be good and valid in law, in like manner as wills made in this state are declared to be.” Section 15 entitles the executors to probate on such copies, and authorizes the court to gi;ant administration with the will annexed. Section 16 is in these words: “ That the sale and conveyance of lands devised to be sold shall be made by the executors, or such of them as shall undertake the execution of the will, if no other person be appointed for that purpose, or if the person so appointed shall, refuse to perform the trust, or die before he shall have accomplished it; but if none of the executors named in such will shall qualify, or, after they have qualified, shall die before the sale and conveyance of such land, then, in those cases, the sale and conveyance thereof shall be made by such person or persons to whom administration with the will annexed shall be granted.” This provision is general; it extends to all, wills recorded after the statute took effect, without reference to the state or country in which they were executed, and without reference to the time of their execution, whether before or after the passing of the act. Wills that had been previously recorded, on which letters testamentary had issued, and estates on which letters of adminis *132 tration had been granted, are not within the operation of the act; but all wills that had not been presented, proved, and recorded, and all case» requiring administration, in which letters had not been granted at *the time the law took effect, are within its provision. The distinction seems to be this, that estates which are in progress of settlement before our courts under the former law, should not be interrupted, but proceed as though the law of 1816 had not passed.
Wills, executed, but not recorded before the passing of this act, may be proved and recorded, and the estates may be settled agreeably to its provisions, because the former law can operate only on wills which had been proved, and on which letters had been granted before the present law took effect. The will of Parker was proved and' recorded in the proper court, in the county of Brown, after this law had taken effect, and before any proceedings were had on it in the State of Ohio.
If it had been the intention of the legislature to restrict the operation of the act, by reference to the time when wills were made, or took effect, they would not have provided for the sale and conveyance of all lands devised to be sold, using the past participle, but would have selected terms confining it to the future. This language appears better calculated to embrace wills that have taken effect without reference to the time when, than to such as might afterward take effect. The same inference may be drawn from the language of the repealing clause, which excludes only a certain description of wills, from which we are to understand that all others were to be embraced.
The exclusion is limited to wills on which letters had been granted before the taking effect of the act. The question may here be asked, granted where? I would answer, in the courts of Ohio j because, as to foreign wills, the statute can operate on such only as have been proved and recorded in the state or country where they were made. When this has been done, they are put on a footing with wills made in the state, and like them, are ready to be offered for probate. It would be a strange construction of the law, to exclude a will from its operation, because that has been done which the law itself requires should be done, before it can be brought within its operation.
The obvious interpretation of the act is, that wills made in this state, or made, proved, and recorded in any other Estate, on *133 which letters shall not have been granted in the courts of Ohio, before the taking effect of the act, shall be proceeded on agreeably to its provisions.
Section 12 gives the same effect, to wills made and proved out oí the state, as it does to those that are made within it, and as a power to sell land in a will made within the state, before the taking effect of the act, but recorded after it, is transferred to the administrator with the will annexed, the same transfer of power must take place as to wills which have been made and recorded out of' the state before the act took effect, on being recorded within it after it took effect, and particularly so as to wills made and proved in states where the power has been transferred by statutes similar to our own.
I take it to be a self-evident proposition, that all wills made in this state, without reference to the time when, are to be governed by the provisions of the act of 1816, provided they are proved and recorded in the proper court, after that act took effect; and that authenticated copies of wills, made and proved in any other state, without reference to the time when, are to be goveimed by the provisions of the same act, provided they are presented and recorded in the proper court of this state, after the act took effect. From this proposition it seems to follow, that if a will, made in this state twenty years ago, containing a power to sell land, be presented and proved after the law of 1816 took effect, the administrator with the will annexed may execute the power, because the statute attaches with reference to the time when the will is presented and recorded, and not to the time of its execution; and, for the same reason, if a will made and proved in another state, twenty years ago, containing a similar power, be presented and recorded in this state after that act took effect, it will be governed by its provisions, and the administrator with the will annexed will be vested with same power.
In support of the second branch of this objection, the case of Wooldridge’s heirs v. Watkins, 3 Bibb, has been cited. I have examined that case carefully, without being able to discover much similarity between it and the case under consideration. The wills of Parker and of Wooldridge are *very different. Parker designated specific parts of the lands, and ordered them to be sold, absolutely, and as soon as possible; he directed how the proceeds should be applied, and appointed but one executor, who refused to perform the trust. Wooldridge did not direct any land to be sold, *134 but “left it in the power of his executor» to sell, or exchange any part of his estate, real or personal, as they might judge necessary, for the advantage of his estate,” and appointed four executors, one of whom only qualified and sold the land. The court decided that the case did not come within the statute, because the sale was not directed to be made unconditionally; that it stood as at common law, and that, as the power was not coupled with an interest, it must be executed by all the executors to whom it was delegated.
An attempt has been made to assimilate the cases, by reference to that clause in Parker’s will, which requires his estate to be kept entire, except such parts as his executor, with the advice of his daughter, might think it to the interest of his estate to have disposed of. This clause must relate to those portions of the estate that are not devised to be sold, as will be evident by comparing the different parts of the will.
In the first section, the testator bequeaths to his daughter sundry portions of his personal estate, and the use of a part of his real estate in the State of Virginia, and then subjoins the following clause: “In the meantime my estate is to be kept entire, except such portions as my executor, with the advice of my daughter, may think it to the interest of the estate to have disposed of.” By the second section, he devises all the rest of his estate, both real and personal, to his grandson. By the third section he constitutes his grandson-in-law his executor, with full power to dispose of all his lands in the State of Ohio — -in Kentucky — in Randolph county, Virginia, and also his proportion of the lots in the city of Washington, and declares it to be his desire, that the said property may be disposed of as soon as possible. In the succeeding clause, he declares it to be his will and desire, that all, or any part of his houses and lots in the towns of Norfolk, Portsmouth, and Quasport, be sold, provided his daughter and Thomas Pearce, of Smithfield, shall think it proper, and for the benefit of his estate.
*Those provisions are distinct, and independent of each other, relating to different parts of his property. The injunction in the first clause, whatever property it may refer to, can not be construed so as to revoke the unqualified power contained in the third clause, which is accompanied with a direction, that it be executed as soon as possible; and it is equally certain, that the fourth clause, which gives a qualified power to sell the property therein described, can not affect it. The rule for construing wills is more liberal than that *135 which applies to deeds. As to the former, it is the object of courts to give effect to the intent of the testator, which they ascertain from his words, giving to them such a construction as will permit every part to stand. Formal and technical words are dispensed with when the intent can be clearly collected. 1 Fonb. 442. In Osgood v. Franklin, Chancellor Kent says, the intention of the testator is much regarded in the construction of powers to sell, and they are construed with greater or less latitude, in reference to that intent. 2 Johns. Ch. 22.
The same doctrine is laid down in 3 Term, 665; 4 Term, 741, n.
From an examination of the whole of Parker’s will, there can not be a doubt but that he intended to vest in his executor an absolute, unqualified power to sell the Ohio land.
The three provisions that have been noticed, are different in their qualifications, and must refer' to different portions of the estate. The property to which the first clause relates, is to be disposed of, with the consent of the daughter. That described in the third clause, is to be sold by the executor immediately, without tho> advice or consent of any other person; while the houses and lots in the fourth clause are to be sold, provided the daughter and Thomas Pearce should think it for the benefit of the estate. If the condition in the first clause maybe extended to the third, that in the fourth may be extended both to the first and third, so that the consent of the daughter and Pearce would bg necessary to authorize a sale of any portion of the estate, which would be contrary to the intention of the testator. The plain construction of the will is, that so much *of the estate, as is not embraced in the third and fourth sections, shall be kept entire, unless the daughter consent to have it disposed of; that the land mentioned in the third section shall be sold by the executor, as soon as possible ; and that the houses and lots in the fourth clause may be sold, provided the daughter and Thomas Pearce think it advisable. The intention of the testator, then, admits of no doubt. He has enjoined it on his executor to sell the Ohio lands as soon as possible ; but if this power can not be executed without the consent of the daughter; if the trustee can not do what the will positively enjoins, wTithout her approbation, the power is subject to a condition that may defeat it. The rule laid down by Lord Holt, in Winters v. Loveday, Carth. 429, is, that where a qualification is annexed to a power, which, if observed, goes to destroy it, the law *136 will dispense with such qualification. If the will, then, be susceptible of the construction contended for by the defendants, it ought to be rejected, for the purpose of preserving the power, and of giving effect to the intention of the testator.
2. The second ground to be considered is the alleged inadequacy of price. On this point the authorities do not seem to furnish any settled rule. In the case of White v. Damon, 7 Ves. 30, in which the lord chancellor refused to decree a specific execution, the price was less than half the actual value of the premises. The title was undisputed, and there were circumstances of unfairness in the time and place of sale.
In the case of Coles v. Trecothick, 9 Ves. 246, Lord Eldon declared, that unless the inadequacy of price was such as to shock the conscience, and amount in itself to conclusive and decisive evidence of fraud in the transaction, it was notitself asuffieient ground for refusing a specific performance.
In Burrows v. Lock, the master of the rolls declared his doubts, whether he could refuse to act on a contract, merely on the ground of inadequacy of price, where fraud was out of the case. 10 Ves. 474.
In 13 Ves. 103, it is declared, inadequacy of consideration, though not of itself sufficient to set aside a contract, is, when gross, strong evidence of fraud.
*In the case of Floyer v. Sherard, Amb. 18, which was an appeal from a decree made at the rolls, the chancellor refused to set it aside, on the ground of inadequacy, because there was no evidence of any particular imposition by the plaintiff.
In the case of Eastland v. Vanarsdel, cited from 3 Bibb, there was not only inadequacy of price, but strong circumstances of fraud. The complainant, who was the purchaser, had the reputation of a sharper ; he drew the contract, and omitted a very important part of the consideration. The facts were such, as induced the court to declare the bargain unreasonable, hard, and unconscientious.
The doctrine laid down in 2 Powell, 78, is, that inadequacy of price alone, when all parties are informed respecting that about which they are contracting, is not a sufficient ground for a court of equity to refuse to give its sanction to a contract, unless the consideration be inadequate in a degree that will warrant the *137 court to conclude fraud from the internal evidence the transaction itself furnishes.
The inference to be drawn from the authorities seems to be, that inadequacy of price will not justify a court in rejecting a contract, or refusing to execute it, unless fraud be actually proved, or irresistibly inferred from the facts of the case. In the absence of such proof, fraud can not be established by inference, especially in a contract for the sale of an estate, the value of which depends on a contingency, of which the purchaser is to stand the risk. When the title, or the valuó of the thing contracted for, is understood to be uncertain, or contingent, the validity of the contract is never affected by the result, otherwise such property could not be the subject of a certain contract. Men may make risking bargains, in which the price stipulated is influenced by the degree of risk to be run; and when a purchaser takes the risk on himself, it is not expected that he will pay the intrinsic value of the property. An abatement is made in proportion to the risk, which is estimated by the parties themselves, and can not be regulated by the conscience of the chancellor. The objection of inadequacy is therefore properly confined to cases where the purchaser stipulates for a sound title, and for a recourse if it *prove defective. In such a case an estimate may be made, and the difference between the value and the price may be ascertained ; but, in the case before us, this is wholly impracticable. Wills contracted for nothing more than the right of Parker; if that failed he was to lose the purchase money. He took upon himself a risk, the consequences of which can not be estimated by this court. It is known, however, that the uncertainty of title, in the Tirginia military district, is proverbial, and that in many cases it is impossible to ascertain the existence of conflicting claims, till they are set up by the claimants. The parties themselves were the best judges of these circumstances, and have contracted accordingly. There is no evidence of fraud, nor can it be inferred, because it is wholly uncertain whether the price stipulated be more or less than the value of the right to be received. In the case of Osgood v. Franklin, Chancellor Rent lays great stress on the defects and difficulties of title. He observes that lands, in such a situation, have no determinate value, and are not to be estimated by the price of improved farms, or lots which have a clear title; and, although the estimated value of the property in that case was two hundred thousand dol *138 ars, and the price paid but twenty-five thousand dollars, ho sustained the contract.
3. The third objection is, that complainant has been guilty of laches, in not paying the purchase money, at the time agreed on in the contract. To estimate correctly the force of this objection, it will be necessary to advert to the facts. The contract'was made in April, 1815. The purchase money was to have been paid in June following, when the deed was to be executed, with a special warranty only. Before the day of payment, complainant discovered that a bill had been filed, in the county of Brown, by Gilliland and others, in which they set up a title to the same land, under a contract with Parker, in his life. Pending that bill, Baker, the administrator, died. In April, 1817, the defendant, A. P. P. Cowper, was appointed administratrix, with the will annexed. Between the death of Baker, and the appointment of Mrs. Cowper, there was no person authorized to receive the money, or make a deed; but Wills, anticipating the appointment of Mrs. Cowper, applied to *her to know whether she would receive the money and perform the contract, which she refused to do. The present bill was filed in 1818. On May 2,1815, oomplain'ant wrote, stating that he did not expect to be able to pay the purchase money on the day stipulated, and requested further time. On June 29th following, he wrote, expressing doubts as to the power of the administrator to convey, and proposing a new contract. A part of the land has not yet been carried into grant, and a part has been patented to Josiah Cowper, the devisee.
It was urged that the payment of the money was a condition precedent, and that, inasmuch as Wills did not perform that condition, he is without remedy .at law; and that, therefore, equity will not relieve, as it would be a violation of -the rule, that when damages can not be recovered at law, on a contract, equity will not decree a specific performance. This rule is not general in its application ; it does not relate to defective contracts, nor is it generally applied to the negligence, or omission of the parties, for in both of these casos equity does and will relieve ; but it applies particularly to contingent contracts, on which an action at law can not be sustained, because the contingency provided for does not happen. It is sometimes applied to contracts without consideration, as was the case in Hickman v. Grimes, cited from I Marshall, 87, or where the consideration is so trifling that mere nomi *139 nal damages could be recovered. 2 Pow. on Cont. 243. But I can not admit the proposition, that the payment of the money in this case is a condition precedent. The engagements are simultaneous ; tho same day is fixed for the payment of the money, and the execution of the deed. Neither party has relied on the promise of the other, as his security, but on an actual performance.
The complainant was not bound to part with his money till he received the deed, nor was the defendant liable to be called on for a title, till the consideration money was paid. This being the case, an omission to perform, by either party, could not be considered as a forfeiture of the contract, while the other party was either unprepared, or refused to execute on his part, unless an unreasonable delay had been mutually acquiesced in, from which a voluntary abandonment *might be inferred. It is true, that Wills did not pay the money on June 20th ; but it is equally true that the administrator was not then either prepared or willing to convey the title.
It was attempted to support the charge of laches on the ground that time is of the essence of contracts. This principle can not be admitted to the extent contended for. The fair inference to be drawn from the cases on this point is, that time is not of the essence of contracts, or, in other words, that equity does not consider an omission to perform, on the day stipulated, as sufficient, in itself, to reject a bill for a specific performance. On the contrary, chancery will relieve, where there has been default in time, if compensation can be made; and it has been held, that lapse of time in payment, may be compensated by interest and cost, if the delay has not been unreasonable and unnecessary. Bills have been sustained in favor of vendors who had no title at the time they were to convey, or at the filing of their bills. Lord Thur-low decided that, although a contract contained a clause that it should be void if the stipulations as to time were not compliéd with, yet equity would not consider the performance at the day an essential part of tha contract; and in the case of Thompson, etc. v. Riddle, ho declared, that it had been often attempted to get rid of' a contract on that ground, but without success; that such an omission had never been held to make the agreement void, though it might be evidence of the waiver. 2 P. Wms. 66, 629; 7 Ves. 202; New. on Cont. 235, 238, 242. It is laid down *140 in 2 Pow. on Cent. 272, that the time limited for the performance of an agreement, having lapsed, is no solid objection to a decree for a performance of it; for it is the business of a court of equity to relieve against lapse of time, in the performance of agreements, especially if the non-performance does not arise by default of the party seeking to have a specific performance; therefore, a bill brought for a specific performance was decreed in favor of the plaintiff, without any regard to the lapse of time, the lord chancellor observing, that most of the cases relating to the execution of articles for the sale of estates were liable to that objection, but that he thought there was nothing in it, *The same principle is adopted in Tyree v. Williams, 3 Bibb, 367, and in Guest v. Hamfray, 5 Ves. 818. The master of the rolls observed, that if the plaintiff stand acquitted of the charge of practicing unnecessary delay, in making out his title, the court will not refuse him a specific performance, though he suffer time to elapse before he files his bill. On looking into the oases cited from 1 Marshall, 42, 225, and 240, I do not see their application to this case. In each of them there was a total inability, on the part of the complainant, to perform, either before or after the decree ; and in 1 Bibb, 590, the question did not arise on the time of performance, but on the fact, that complainant had neither performed, nor offered to do it at the time of the decree.'
The conclusion, írom a review of the authorities on this point, seems to be, that lapse of time will not prevent a decree, unless it has been so unreasonable, and so far unaccounted for, as to furnish evidence of an abandonment of the contract. Such an inference can not be drawn from the facts in this case. The delay has not been unreasonable, and it is satisfactorily accounted for. The complainant was not bound to part with his money, till he received a deed. The parties were to perform simultaneously. It is in proof, that, on the day fixed on for the performance, the land was in the possession of third persons, who had resided on it many years under a claim of title, founded on a written contract, made with the testator in his life, and that a bilL in chancery to compel a convejmnce was then pending. It also appears that a part of the land had been convoyed, by patent, to Cowper, the devisee, and that a part of it stood on entry and survey, for which no legal title had been obtained. Under these circumstances, it was impossible for the administrator to perform the contract. He could *141 not make a deed, or deliver possession of the premises. The plaintiff, therefore, was under no obligation to pay the purchase money, nor can his equity be impaired on the ground of laches, for not having done it. As the complainant was to run the risk of the validity of Parker’s title, it stood him in hand to see that the paper title was perfect, that he might avail himself of all the benefits of it. Baker covenanted to convey a legal title, which had not been acquired *in June, 1815. The complainant had a right to insist on a legal title, and could not be required to accept of an equitable one. 1 Mod. 430.
To obviate the difficulty produced by these facts, it was urged, on the part of the defendants, that Wills knew them before the contract. The evidence, however, does not support this assertion. There is no proof of notice but the presumption arising from the pendency of the bill, which is of no avail, as this is not a case in which presumptive notice can be relied on. As between Wills and the persons who claimed title by that bill, it would have been notice, but not as between him and third persons. • As the question here arises, he can be charged only with actual notice.
But if such notice were admitted, the consequences contended for do not follow. The contract could not be altered, or revoked, or the rights of the parties varied by it. Admitting that both parties knew of these difficulties, and with that knowledge entered into the contract, the inference would be that the vendor undertook to remove them as a necessary step to enable him to fulfill his agreement. The only use that could have been made of it by either party, would have been by way of excuse for a non-performance on the day stipulated. A large proportion of the contracts for the sale and conveyance of real estate, in the western country, have been made while the vendor had nothing more than an equitable right, resting on an entry. This circumstance has not released him from the necessity of completing his payments, if any were due, to the person of whom he purchased, and of perfecting his title.
Another circumstance that accounts satisfactorily for the non* payment of the money is the death of Baker, before the claim of G-illiland, etc., was decided, and the subsequent disavowal of the contract by Mrs. Cowper, his successor in the administration-From the death of Baker to the appointment of a successor, in *142 April, 1817, there was no person to receive the money, nor did the appointment of the present administratrix remove this difficulty, for the fact can not be disguised that she determined to resist the contract at all hazards, which led to the depositing of the money in bank instead of the actual payment of it on the *contract. In 1815, Baker was not in a situation to convey; there is no evidence that any step has been taken since that time to perfect the title; it is therefore questionable whether the defendants can now execute the contract, notwithstanding they rely so much on the supposed laches of the complainant.
The letters that have been introduced do not seem to have any. bearing on the case. The one dated in May expresses a doubt whether complainant would be able to pay the money when it should become due, and requests further time; but whether he was able to pay, or whether further time was given or not, does not appear, nor is it material, as the defendants were not in a situation to demand it. The second letter expresses doubts as to the power of the administrator to convey. Whether these doubts arose from the imperfect state of the title, or a supposed defect in the power, does not appear; it is certain, however, that the doubts of a party do not affect his legal rights.
The argument drawn from the fact that the object of the testator, in directing this property to be sold, has been lost by the non-payment, would have been entitled to much weight if the omission to pay were justly chargeable on the complainant; but as it results from the inability of the defendants to perform the contract, on their part, it can not be urged to the prejudice of the complainant. It does not appear that the representatives of Parker have taken any trouble to clear or perfect the title. They seem to have been careless and indifferent about the matter, while Wills was doing all in his power to sustain the claim. No part of his conduct has evinced a disposition to abandon the contract.
The objection that no regular tender was made of the purchase money, has been already answered ; it may be added, however, that as the administratrix had refused to receive the money, or execute the contract, although that fact, in a court of law, might not excuse an actual tender, yet connected wiLh circumstances, it is sufficient in equity, where form yields to substance, and things manifestly vain and useless are not required to be done. The pro *143 duction of the money wouid have answered no other purpose than *to test the sincerity of the refusal to receive it, on the one side, and the ability to pay on the other, which was afterward done by a rejection of the money and a deposit of it in bank.†

Note by the Editor. — See also ix. 49; xviii.- 67.